Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (Telephone)
(215) 994-2222 (Facsimile)
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500 (Telephone)
(212) 698-3599 (Facsimile)
Email: jennifer.insley-pruitt@dechert.com

Chad R. Fears, Esq.
Nevada Bar No. 6970
Joshua D. Cools, Esq.
Nevada Bar No. 11941
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102
702-805-0290 (Telephone)
702-805-0291 (Facsimile)
Email: cfears@efstriallaw.com
Email: jcools@efstriallaw.com

*Attorneys for Defendants Uptime Institute, LLC and*
*Uptime Institute Professional Services, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada corporation, | Case No. 2:19-cv-00631-GMN-NJK |
| Plaintiff, | **JOINT STIPULATION AND ORDER FOR PLAINTIFF TO FILE A SECOND AMENDED COMPLAINT** |
| vs. | |
| UPTIME INSTITUTE, LLC, a Delaware limited liability company; and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC, a Delaware limited liability company, | **(FIRST REQUEST)** |
| Defendants. | |

Pursuant to the Court's December 3, 2019 order, Rule 15 of the Federal Rules of the Civil Procedure, and LR IA 6-1, LR IA 6-2, and LR 7-1 of the Local Rules of Court, the parties to this action, acting through counsel, respectfully submit the following Joint Stipulation and Order for Plaintiff to file a Second Amended Complaint (the "Stipulation") and for the Defendants to answer or move in response to the Second Amended Complaint.

///

///

- 1 -

## I. **PROCEDURAL HISTORY**:

On April 11, 2019, Plaintiff filed a Complaint against Defendants for breach of contract, deceptive trade practices, violation of 15 U.S.C. § 1120, cancellation and abandonment under 15 U.S.C. §§ 1119 and 1064, and declaratory relief under 28 U.S.C. § 2201. Plaintiff since amended its Complaint on July 31, 2019. Thereafter, on August 14, 2019, Defendants filed a Partial Motion to Dismiss First Amended Complaint. The Court granted in part and denied in part Defendants' Motion. On December 3, 2019, this Court granted in part and denied in part Defendants' Partial Motion to Dismiss the First Amended Complaint.  D.I. 34.  The Court issued an order permitting Plaintiff to file a Second Amended Complaint within 21 days to amend its claims that were dismissed without prejudice.   Plaintiff has also suggested, and the Defendants have agreed, that the Defendants need not answer or move in response to the First Amended Complaint, because that complaint would be mooted by the filing of the Second Amended Complaint.

Accordingly, the parties now stipulate to Plaintiff filing the Second Amended Complaint and Plaintiff's proposed Second Amended Complaint is attached as **Exhibit 1**.

Also, Defendants seek, with Plaintiff's consent, an extension of 16 days to answer or move in response to the Second Amended Complaint, because Plaintiff has now disclosed to Defendants the substance of the amendments it plans to file, and the amendments will add newly asserted antitrust claims, which will add a measure of complexity to this case.

The parties have met and conferred on all of the above issues and are in agreement. Accordingly, the parties jointly request that this Court grant leave for Plaintiff to file a Second Amended Complaint pursuant to the following deadlines and other agreements:

| | |
|---|---|
| **Deadline for Defendants to Answer First Amended Complaint:** | **Vacated, in light of superseding Second Amended Complaint** |
| **Deadline for Plaintiff to file Second Amended Complaint:** | **Within one day of this Court's Order allowing its filing** |
| **Deadline for Defendants to answer or move in response to Plaintiff's Second Amended Complaint:** | **30 days after the filing of the Second Amended Complaint** |

This stipulation is the product of the parties' active negotiation regarding this and other discovery matters and is not dilatory or intended to unduly delay this litigation.

Respectfully submitted this 27th day of January, 2020.

DECHERT LLP

HOLLEY DRIGGS WALCH
FINE PUZEY STEIN & THOMPSON

BY:   */s/: Diane Siegel Danoff*
Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (Telephone)
(215) 994-2222 (Facsimile)
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500 (Telephone)
(212) 698-3599 (Facsimile)
Email: jennifer.insley-pruitt@dechert.com

Chad R. Fears, Esq. (SBN 6970)
Joshua D. Cools, Esq. (SBN 11941)
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, NV 89102
702-805-0290 (Telephone)
702-805-0291 (Facsimile)
cfears@efstriallaw.com
Email: jcools@efstriallaw.com

*Attorneys for Defendants Uptime Institute,*
*LLC and Uptime Institute Professional*
*Services, LLC*

By:   */s/: Samuel Castor*
James D. Boyle, Esq. (SBN 08384)
Joanna M. Myers, Esq. (SBN 12048)
Jessica M. Lujan, Esq. (SBN 14913
400 South Fourth Street, Third Floor
Las Vegas, NV 89101
(702) 791-0308 (Telephone)
Email: jboyle@nevadafirm.com
Email: jmyers@nevadafirm.com
Email: jlujan@nevadafirm.com

Samuel D. Castor, Esq. (SBN 11532)
SWITCH, LTD.
7135 South Decatur Avenue
Las Vegas, NV 89118
(702) 444-4102 (Telephone)
Email: sam@switch.com

IT IS SO ORDERED:

_____
UNITED STATE MAGISTRATE JUDGE

Dated:   January 31, 2020

Exhibit 1

SAMUEL D. CASTOR, ESQ. (NBN 11532)
ANNE-MARIE BIRK, ESQ. (NBN 12330)
Email: policy@switch.com
SWITCH, LTD.
7135 South Decatur Ave.
Las Vegas, Nevada 89118
Telephone: 702/444-4111

JAMES D. BOYLE, ESQ. (NBN 08384)
E-mail:   jboyle@nevadafirm.com
JOANNA M. MYERS, ESQ. (NBN 12048)
E-mail:   jmyers@nevadafirm.com
JESSICA M. LUJAN, ESQ. (NBN 14913)
E-mail: jlujan@nevadafirm.com
HOLLEY DRIGGS WALCH
FINE PUZEY STEIN & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308

*Attorneys for Plaintiff /Counter-Defendant
Switch, Ltd.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>UPTIME INSTITUTE, LLC, a Delaware limited liability company; and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.:      2:19-cv-00631-GMN-NJK<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) Breach of Contract**<br>**(2) Deceptive Trade Practices**<br>**(3) Violation of 15 U.S.C. § 1120**<br>**(4) Cancellation and Abandonment Under 15 U.S.C. §§ 1119 and 1064**<br>**(5) Violation of 15 U.S.C. § 1**<br>**(6) Violation of Nev. Rev. Stat. § 598A.060**<br>**(7) Declaratory Relief under 28 U.S.C. § 2201**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff Switch, Ltd. ("Switch"), by and through its undersigned counsel, for its

Second Amended Complaint against Defendants Uptime Institute, LLC ("Uptime") and

Uptime Institute Professional Services, LLC ("Uptime IPS") (together, "Defendants"),

- 1 -

hereby allege as follows:

## I.    JURISDICTION

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or total of $75,000.00.

2.     Furthermore, this Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §§ 1119, 1120, and 1121, and 28 U.S.C. §§ 1331 and 1338, as Switch's claims for relief arise under the Lanham Act of 1946, as amended, 15 U.S.C. § 1051, *et seq*.

3.     This Court has supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to supplemental jurisdiction under 28 U.S.C. § 1367 and 1338(a), because the state law claims are integrally related to Switch's federal claims and are part of the same case or controversy and arise from a common nucleus of operative facts.

4.     Jurisdiction in this Court over Switch's claim for declaratory relief is proper pursuant to 28 U.S.C. § 2201 as an actual controversy exists within this Court's jurisdiction.

5.     Personal jurisdiction over Uptime is proper as Uptime has substantial, continuous and systematic contacts with the state of Nevada, and/or Uptime has purposefully directed its activities to residents of the state of Nevada, including Switch, and with corporations doing business in Nevada, which activities have resulted in injuries to Switch, as alleged herein.

6.     Personal jurisdiction over Uptime IPS is proper as Uptime IPS has substantial, continuous and systematic contacts with the state of Nevada, and/or Uptime IPS has purposefully directed its activities to residents of the state of Nevada, including Switch, and with corporations doing business in Nevada, which activities have resulted in injuries to Switch, as alleged herein.

///

7.	Uptime and Uptime IPS solicit and/or engage in business in the state of Nevada by, at a minimum, soliciting and engaging multiple data center providers as clients/members which are domiciled in or operate in Nevada, including Switch and Flexential (f/k/a ViaWest) ("ViaWest" or "Flexential"), which clients/members have engaged in business with Uptime and Uptime IPS by acts that include, but are not limited to: paying for Uptime and/or Uptime IPS's alleged certifications; certifying multiple data center facilities in Las Vegas, Nevada (including Switch and Flexential); and participating in trade shows in at least Las Vegas, Nevada through which Uptime and /or Uptime IPS solicit and obtain business from Nevada corporations and others.

8.	Uptime and/or Uptime IPS' website reflects that Uptime and/or Uptime IPS have several customers in Nevada. Thus, by virtue of Uptime's and/or Uptime IPS's Nevada-based customers, Uptime and/or Uptime IPS have developed and maintain contractual obligations with residents of the state of Nevada, have received material benefit from doing business in this jurisdiction, and have purposefully availed themselves of the privileges of conducting activities in the state of Nevada, which activities, in part, gave rise to the instant action and establish personal jurisdiction in this district.

9.	Uptime and Uptime IPS' acts and actions as set forth herein have resulted in the injuries to Switch as alleged herein.

## II.  VENUE

10.	Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to Switch's claims occurred in this judicial district.

## III.	PARTIES

11.	Plaintiff Switch, Ltd. is a Nevada corporation, with its principal place of business located at 7135 South Decatur Boulevard, Las Vegas, Nevada 89118.

12.	Defendant Uptime Institute, LLC is a Delaware limited liability company, which, upon information and belief, has its principal place of business located at 5470

1  Shilshole Avenue N.W., Suite 500, Seattle, Washington 98107.

2      13.    Defendant Uptime Institute Professional Services, LLC is a Delaware

3  limited liability company, which, upon information and belief, has its principal place of

4  business located at 5470 Shilshole Avenue N.W., Suite 500, Seattle, Washington 98107.

5             **IV.    FACTS**

6      14.    Switch brings this action against Uptime and Uptime IPS for breach of

7  contract and deceptive trade practices in violation of Nev. Rev. Stat. 598.50903 *et seq.*,

8  cancellation of Uptime's marks based on fraud (violation of 15 U.S.C. § 1120),

9  cancellation of Uptime's mark registrations under the Lanham Act (15 U.S.C. § 1064,

10  §1119), and for declaratory relief pursuant to 28 U.S.C. § 2201.

11      15.    Switch's causes of action under the Lanham Act and request for

12  declaratory relief are based upon Uptime's improper and fraudulently procured federal

13  service mark registrations for the marks TIER GAP ANALYSIS (Reg. No. 4900276),

14  UPTIME INSTITUTE TIER IV CERTIFIED (Reg. No. 4446381), ACCREDITED TIER

15  SPECIALIST (Reg. No. 4503935), ACCREDITED TIER DESIGNER (Reg. No.

16  4503936), ATS ACCREDITED TIER SPECIALIST UPTIME INSTITUTE (Reg. No.

17  4670383), ATD ACCREDITED TIER DESIGNER UPTIME INSTITUTE (Reg. No.

18  4670382), and TIER-READY (Serial Number 87436668) (collectively, "Uptime Marks"),

19  Uptime's erroneous claims to exclusive nationwide rights to use of the term "Tier", and

20  Uptime's failure to properly control the quality and use of its certification marks, which

21  has directly damaged Switch as alleged herein.

22             **Background Regarding Switch**

23      16.    Switch is a leading global technology solutions corporation whose core

24  business is the design, construction, and operation of ultra-advanced data centers

25  (the "Switch Services"). Switch is widely known as one of the world's leading designers,

26  builders, and operators of data centers. Switch's facilities sustainably power, cool, and

27  protect the physical infrastructure and networks necessary to run the Internet.

- 4 -

17.    Switch's patent-pending and patented technologies are used by hundreds of clients. Switch's clients range from Fortune 100 entities to governmental agencies, all of which obtain Switch's services because of Switch's reputation and performance as the preeminent designer, builder and operator of data centers.

18.    In addition to being well-known for its innovative technologies and confidential approach to its services, Switch is also recognized for providing military grade physical security to protect its customers' data. Switch's facilities are built to the highest standards and are monitored 24/7/365 by armed security personnel.

19.    Switch competes in a highly-competitive national and global marketplace for technology clients, with a wide array of other data center providers, cloud providers, hosting providers, and technology companies.

20.    Because potential customers can store their data anywhere, including in their own buildings, in their own data center, with a cloud provider, with a telecommunications carrier, with a managed service provider, or with a data center provider, Switch competes nationally, and globally, with a vast array of technology companies in multiple verticals to protect its brand and attract clients.

21.    Switch's provision of the Switch Services and its technology collaboration ecosystem gives its clients access to diversified and wide-ranging options for innovation, economies of scale, risk mitigation, sustainability, operational excellence, and investment protection.  Switch provides the Switch Services to a global-reach of customers through its state-of-the-art facilities and data-centers throughout the United States and in various international locations.

**Background Regarding Uptime**

22.    Uptime touts itself as an unbiased advisory organization focused on improving the performance, efficiency, and reliability of business-critical infrastructure through innovation, collaboration, and independent <u>certifications</u>. However, Uptime does not offer unbiased or independent certifications.

23.    For a costly fee (in the multiple thousands of dollars), Uptime's affiliate (Uptime IPS) offers customers an opportunity to obtain "<u>certifications</u>" for the design, construction, and/or operation of a customer's data center(s).

24.    After undergoing a purported "rigorous Tier Standards and Certifications" audit by an "independent" Uptime IPS professional, Uptime (through Uptime IPS) awards its customers a certification seal, supposedly validating the integrity and quality of either a data center engineer's training, or the design, constructed facility, or operational integrity of a data center.

25.    Uptime publicly claims (and falsely represented to Switch) that Uptime created the four "tier" classification standard, but in fact, the "tier" vernacular and classification standard were created in or around 1998 by a former client of Uptime's predecessor-in-interest. Uptime has no independent "right" or "privilege" to assert exclusive rights to use the "tier" vernacular.

26.    The "tier" classification standard and "tier" vernacular were created by the original author to be used throughout the industry as a means to convey complex data center reliability concepts to a company's senior management team—a team that generally consists of business leaders (not engineers) and who are responsible for making decisions regarding data center facility acquisition and use. The "tier" classification standard and "tier" vernacular were not created as a proprietary methodology or mark over which Uptime could (or can) assert exclusive ownership or use rights.

27.    Uptime and/or Uptime IPS falsely represents to the world (and falsely represented to Switch) that its "tier" classification and certification system is unique, exclusive, and valuable in demonstrating a level (falsely) of design, construction, and/or operation of a customer's data center(s).

### **Uptime's Deceptive Trade Practices**

28.    On its website, Uptime and/or Uptime IPS, represents to the public, including Switch, that "Uptime Institute's Tier Standard and the associated certifications

are the single most important investment" a data center can make.

29.     Uptime and/or Uptime IPS, falsely claims that "…[t]he Standard is administered by the author of the standard itself, assuring the letter of the standard and encompassing the vast experience of our team. Tier Certification is not theory, it is fact. It is a recognized certification by an independent engineering team with a correctly implemented vision, and an implementation to meet stated business needs."

30.     Uptime further falsely claims that its "Tier Standards are an unbiased set of infrastructure and operating criteria that are unique in the industry for their rigor and comprehensiveness. No other credential carries the weight and stature of Tier Certification, and no other data center standard is actually certified by the standard's author itself."

31.     In an effort to support its false claims and rewrite history regarding the origin of the "tier" classification system and "tier" vernacular, Uptime and/or Uptime IPS has improperly amended the original white papers published on the subject (which accurate authorship credit and attribution) and republished such papers with the authorship and attribution omitted.

32.     At all times relevant hereto, Uptime and/or Uptime IPS knew or should have known that they did not have exclusive ownership or use rights to the "tier" classification standard and "tier" vernacular.

33.     Switch's brand is central to its value because potential customers have many options to choose where they can store their data or technology: *e.g.* on site within their business, remotely in their own data center, with a cloud provider, with a telecommunications carrier, with a managed service provider, or with a colocation provider such as Switch. Switch competes nationally, and globally, with a vast array of technology companies (not just colocation providers) and uses its brand to differentiate itself from its national and global competition. Consequently, Switch's services compete with hundreds of competitors in the national and global technology infrastructure

- 7 -

marketplace.

34.     As a result of Uptime and/or Uptime IPS' false representations regarding its ownership and the exclusive nature of its alleged "tier" certifications, Switch believed Uptime and/or Uptime IPS certification was of high value, when in fact it was (and is) not.

35.     Specifically, Uptime and/or Uptime IPS falsely represented to Switch that the Uptime and/or Uptime IPS certifications were valuable and would set Switch apart from Switch's competitors as Switch would be one of only a few "Tier IV" data centers certified by Uptime in the world. Moreover, Uptime and/or Uptime IPS falsely represented to Switch that they had exclusive ownership or use rights to the "tier" classification standard and "tier" vernacular when in fact they did not have any such exclusive ownership and/or use rights.

36.     In reliance on Uptime's and Uptime IPS's representations, Switch entered into several contractual proposals with Uptime, and paid Uptime and/or Uptime IPS hundreds of thousands of dollars, for the cost of certifying Switch's design, construction and operation of Switch's data centers.

37.     On or about August 9, 2013, Switch and Uptime entered into a contractual proposal for the certification of Switch's SuperNap 8 Data Center located in Las Vegas, Nevada ("SuperNap 8 Contract"). The SuperNap 8 Contract provided that in exchange for receiving Uptime and/or Uptime IPS' "operations" certification, Switch would pay Uptime and/or Uptime IPS in excess of $225,000.00.

38.     On or about November 14, 2014, Switch and Uptime entered into a contractual proposal for the certification of Switch's SuperNap 9 Data Center located in Las Vegas, Nevada ("SuperNap 9 Contract"). The SuperNap 9 Contract provided that in exchange for receiving Uptime and/or Uptime IPS' "design," "facility," and "operations" certifications, Switch would pay in excess of $260,000.00.

///

39.     Switch underwent multiple audits and inspections by Uptime IPS to obtain two separate "Tier IV" design certifications, "Tier IV" facility certifications, and "Tier IV" Gold certifications, for Switch's data centers. Switch pursued these "certifications" with Uptime and/or Uptime IPS based on Uptime's and/or Uptime IPS's assurance that the certifications it issued to Switch would provide valuable transparency and quantifiable market differentiation from Switch's competitors, and based upon the representation that Uptime and/or Uptime IPS had exclusive ownership or use rights to the "tier" classification standard and "tier" vernacular. Uptime's and/or Uptime IPS's representations to Switch regarding these "certifications" constituted a knowing false representation that Uptime's services were of a particular standard, quality and/or grade, when in fact the "certifications" were of another standard, quality and/or grade.

40.     Unbeknownst to Switch at the time it entered into the contractual proposals, Uptime and/or Uptime IPS was knowingly permitting other data center facilities to falsely claim receipt of and use Uptime's certification to convey to the public that a data center was certified by Uptime and met certain standards, when in fact such data center(s) were not certified by Uptime and did not meet standards.

41.     Moreover, at the time Switch entered into the contractual proposals with Uptime and/or Uptime IPS, and contrary to Defendants' misrepresentations that induced Switch to enter into these agreements, the certifications Uptime and Uptime IPS issued were not of exceptional or high value. Rather, the certifications were of little to no value as Uptime and/or Uptime IPS failed (and continues to fail) to exert any quality control over third-party misuse of the certifications.

42.     The deception was, and continues to be, perpetrated via Uptime and/or Uptime IPS's design and facility certification scheme, which is misleading to the public (and to Switch) and constitutes deceptive trade practices.

43.     For example, Uptime and/or Uptime IPS issues certifications for the <u>design</u> of data centers, which merely certifies the functionality and capacity evidenced in the

engineering and architectural specifications of a facility <u>that has not yet been built</u>. Uptime and/or Uptime IPS permits its "design" certified data centers to use the Uptime Marks to convey to the public the data center meets certain quality standards, when in fact the actual physical structure may not be consistent with the initial designs and therefore does not meet quality standards that Uptime and/or Uptime IPS promote.

44. Uptime and/or Uptime IPS also identifies its "design" certified data centers on its own website, which misleads consumers into believing the data centers meet certain quality standards, when in fact they do not. Thus, Uptime and/or Uptime IPS grants "certifications" to data centers based on pre-build designs despite the fact the data center may not ever be built to that design.

45. For example, ViaWest paid Uptime and/or Uptime IPS for a "design" certification. Uptime and/or Uptime IPS granted ViaWest a "Tier IV" "design" certification, when in fact, the ViaWest facility as built only satisfied the standards of Uptime's purported "Tier III" standard. In an effort to deceive, ViaWest advertised and promoted itself as a certified Uptime and/or Uptime IPS "Tier IV" facility—which was patently false.

46. Similarly, Uptime and/or Uptime IPS granted Swanson Rink—a data center in Colorado—a "Tier IV" "design" certification, but Swanson Rink's facility only met Uptime and/or Uptime IPS' "Tier II" facility standards. In an effort to deceive, Swanson Rink advertised and promoted itself as an Uptime and/or Uptime IPS "Tier IV" facility—which was patently false.

47. Switch informed Uptime and/or Uptime IPS on multiple occasions that its "design" and "facility" certification scheme was resulting in deception, devaluing the certifications Switch for which paid hundreds of thousands of dollars, and harming Switch's ability to fairly compete in the marketplace.

48. Uptime and/or Uptime IPS refused to prevent or stop such deceptive use and/or aided in the perpetuation of the abuse of the Uptime Marks.

49. Uptime and/or Uptime IPS' deceptive "design" and "facility" certification scheme garnered the attention of the Nevada Attorney General. On February 2, 2015, the Nevada Attorney General sent a letter to Uptime and/or Uptime IPS' client ViaWest, Inc. requesting documentation proving why ViaWest was not in violation of NRS 598 based on advertising that claimed ViaWest was certified by Uptime as a "Tier IV" data center, when in fact it was not. Rather, ViaWest had been issued a "Tier IV" design certification by Uptime and/or Uptime IPS, despite the fact it was not, and is unlikely to ever be, a "Tier IV" facility.

50. Despite Switch, and other members of the public, having notified Uptime and/or Uptime IPS on more than one occasion of the ongoing misuse and abuse of the Uptime IPS certifications, neither Uptime nor Uptime IPS prevented (or prevents) the misuse and abuse.

51. As a result of Uptime and/or Uptime IPS' misleadingly deceptive "design" and "facility" certification scheme, Switch has lost customers and suffered significant damages. Specifically, Switch has lost multiple clients due to Uptime and/or Uptime IPS's deceptive issuance of "design" certifications for data centers facilities that do not meet the same "facility" standard. The certification scheme and resulting abuse of the Uptime and/or Uptime IPS certifications leads Switch's potential clients to mistakenly believe the competing data center is an equivalent facility, when in fact they are not.

52. Moreover, Switch's customers and potential customers challenge the cost of Switch's higher-tier data center and demand lower prices from Switch because lower-tier data centers are setting lower prices and charges when such lower-tier data centers are using (with Uptime and/or Uptime IPS's knowledge and consent) deceptive certifications issued by Uptime and Uptime IPS to falsely claim higher-tier Uptime certifications.

53. Based on such unregulated and deceptive use of the Uptime Marks, Switch has suffered, and will continue to suffer, damage to Switch's business.

///

- 11 -

**Uptime's Fraudulent Mark Registrations,
Naked Licensing, and Failure to Police Uses of the Uptime Marks**

54.     Despite the Uptime Marks' use as <u>certification</u> marks, not to offer any services, Uptime improperly and fraudulently acquired the following <u>service</u> mark registrations with the USPTO:



a.     – filed on October 24, 2012 as Serial No. 85762454, and registered on December 10, 2013 as Registration No. 4,446,381, and claiming a first date of use and first date of use in commerce of August 25, 2009;

b.     ACCREDITED TIER DESIGNER – filed on July 23, 2012 as Serial No. 85684245, and registered on April 1, 2014 as Registration No. 4,503,936, and claiming a date of first use and date of first use in commerce of September 30, 2009;

c.     ACCREDITED TIER SPECIALIST – filed on July 23, 2012 as Serial No. 85684221, and registered on April 1, 2014 as Registration No. 4,503,935, and claiming a date of first use and date of first use in commerce July 21, 2010;



d.     – filed on April 30, 2014 as Serial No. 86267713, and registered on January 13, 2015 as Registration No. 4,670,382, and claiming a first date of use and first date of use in commerce of September 30, 2009;



e.     – filed on April 30, 2014 as Serial No. 86267721, and registered on January 13, 2015 as Registration No. 4,670,383, and claiming a date of first use and a date of first use in commerce of July 31, 2010; and

///

f. TIER GAP ANALYSIS – filed on November 4, 2014 as Serial No. 86444262, and registered on February 16, 2016 as Registration No. 4,900,276, and claiming a date of first use and a date of first use in commerce of March 31, 2014.

55. Uptime also owns a pending intent-to-use trademark application before the USPTO for the mark TIER-READY, which was filed on May 4, 2017 and assigned Serial No. 87436668.

56. Uptime does not offer the services it claims it offers under these Uptime Marks. In fact, Uptime does not offer any of these services to customers. Rather, according to Uptime, Uptime IPS uses these marks to offer and award its alleged "certifications" and does not itself offer services in association with these marks.

57. Even though Uptime admits that Uptime IPS offers "certification" services, neither Uptime nor Uptime IPS has registered any certification marks with the USPTO. Nevertheless, Uptime and/or Uptime IPS claims to have "certified over 1000 leading data center facilities worldwide for design, construction, management, and operations."

58. Recipients of Uptime's and/or Uptime IPS's certifications are awarded a letter, a foil (incorporating the Uptime Marks), and/or website-listing bearing one or more of the Uptime Marks, for use by the recipient to convey to the public the recipient is certified by Uptime. The foils use the phrase "certified." Therefore, the public perception of the Uptime Marks is that they are certification marks, not service marks.

59. As such, the public (including Switch) has been, and continues to be deceived, and the USPTO has been misled, as to Uptime's use of the Uptime Marks.

60. The public perception that the Uptime Marks are certification marks is further evidenced by the manner and context of Uptime's use of the Uptime Marks on the specimens Uptime submitted to the USPTO in support of registration for the Uptime Marks.

///

61.     The Uptime Marks serve as <u>certification</u> marks as defined in Section 45 of the Lanham Act, not service marks. Registrations issued by the USPTO for a service mark, when the marks are in fact certification marks, are invalid, void ab initio, and must be cancelled.

62.     The specimens Uptime submitted to the USPTO, the manner in which Uptime IPS uses the Uptime Marks, and Uptime's own assertions, namely, that Uptime IPS is the only organization permitted to <u>certify</u> data centers under the Uptime Marks, indicates that Uptime's pursuit of, and the USPTO's issuance of, <u>service</u> mark registrations was inappropriate, fraudulently obtained, and ultimately led to the creation of public confusion regarding the certification procedures proffered by Uptime.

63.     Switch is informed and believes, and thereupon alleges, that Uptime and/or Uptime IPS is not using the Uptime Marks "in commerce" for the services identified in the registrations for the Uptime Marks.

64.     Because Uptime IPS is not using the Uptime Marks as service marks to identify the source or origin of Uptime IPS services, nor to certify goods or services which purportedly meet certain standards in relation to quality, materials, or mode of manufacture, the Uptime Mark registrations are invalid and must be cancelled.

65.     Moreover, Switch is informed and believes, and thereupon alleges, that Uptime knowingly made false, material, misrepresentations of fact that the Uptime Marks have been used in commerce in connection with the services identified in the respective registrations, with the willful intent to deceive the USPTO for the purposes of obtaining registrations for the Uptime Marks as <u>service</u> marks, rather than <u>certification</u> marks.

66.     Switch is informed and believes, and thereupon alleges, that Uptime intentionally sought the wrong type of mark registration from the USPTO because the rights of a certification mark registrant differ significantly from those of a service mark registrant in that a certification mark must be made available without discrimination to certify the goods/services of any person who maintains the standards or conditions which

- 14 -

such mark certified.

67.     Switch is informed and believes, and thereupon alleges, that Uptime intentionally misled the USPTO into registering its marks as <u>service</u> marks to avoid the more rigorous examination the USPTO conducts prior to approving registration of <u>certification</u> marks.

68.     In order to acquire a proper registration as a <u>certification</u> marks, Uptime would have had to provide the USPTO with: (1) a copy of Uptime's certification standards governing use of the certification mark on or in connection with Uptime's services; (2) a verified statement that Uptime is not engaged, and will not engage, in the marketing of <u>services</u> to which the mark is applied, except to advertise or promote recognition of the certification program or services that meet certification standards of Uptime; (3) a specimen of use showing how third parties use the Uptime Marks; and (4) a date of first use that its certification mark was used by Uptime's authorized users, because it cannot be used by Uptime itself.

69.     Pursuant to Section 15 of the Lanham Act § 1064(5), using a mark for two different purposes (*i.e.*, use for certifications and as a trademark or service mark), invalidates a mark.

70.     Upon information and belief, Uptime's false statements to the USPTO regarding the nature of Uptime and/or Uptime IPS's use of the Uptime Marks were material misrepresentations because Uptime's use of the marks is as <u>certification</u> marks, not <u>service</u> marks and as such, the USPTO would not have issued registrations for the Uptime Marks without Uptime's meeting of the heightened application requirements.

71.     On October 24, 2012, a representative of Uptime filed a service mark application with the USPTO for the mark TIER IV UPTIME INSTITUTE CERTIFIED (and design) (Ser. No. 85762454) fraudulently asserting (under penalty of perjury) that Uptime was the owner and source using the mark for "Consulting services in the field of data center design, management and operation; Analysis and evaluation of data center

- 15 -

design and facilities <u>for the purpose of certifying</u> new and existing data centers" in International Classes 35 and 42, when in fact, Uptime IPS uses the mark to <u>certify</u> the goods/services of third-parties.

72. The specimen submitted to the USPTO on October 24, 2012 indicates that Uptime IPS and not Uptime is the true source of any services performed using the TIER IV UPTIME INSTITUTE CERTIFIED mark. The specimen factually states that "Uptime Institute Professional Services team of consultants reviews 100% drawings in our offices" and "Uptime Institute Professional Services team of consultants gathers data on site over multiple days in order to validate the facility's Tier objective." The specimen factually states that once the Uptime IPS entity performs the services claimed under the applied for mark, "<u>A successful review culminates with Uptime Institute awarding a letter and foil of Tier Certification of Design Documents</u>" and/or "<u>The successful completion of the on-site review culminates with Uptime Institute awarding a letter, foil, and plaque of Tier Certification of Constructed Facility</u>". The specimen poses the following question to potential customers: "Why Uptime Institute Professional Services? FIRST & ONLY to consult and <u>Certify</u> to the Tier Classification System and Operational Sustainability Standards". The specimen is stamped with the Uptime IPS mark (Uptime Institute$^{TM}$ professional services, LLC) to further indicate that Uptime IPS is the true owner and user of the applied for mark.

73. On May 24, 2013, in response to an Office Action mailed November 27, 2012, Uptime bifurcated its claimed services. Uptime designated services related to "Consulting services in the field of data center design, management and operation" to International Class 035 and designated services related to "Analysis and evaluation of data center design and facilities <u>for the purpose of certifying</u> new and existing data centers" to International Class 042, effectively admitting and acknowledging that there are categorical differences between "Consulting services" and "Analysis and evaluation for the purpose of certifying".

- 16 -

74.     Additionally, Uptime resubmitted an identical or substantially similar specimen as was filed on October 24, 2012, again fraudulently asserting that Uptime was the owner and source of the services for the TIER IV UPTIME INSTITUTE CERTIFIED mark, however, the specimen still indicated that Uptime IPS and not Uptime is the true source of any services performed using the mark.

75.     On April 5, 2019 Uptime filed a Combined Declaration of Use and Incontestability under Sections 8 & 15.  The Declaration resubmits substantially the same specimen as was filed during the application process, except the stamp indicating Uptime IPS (Uptime Institute$^{TM}$ professional services, LLC) as the user and source of the TIER IV UPTIME INSTITUTE CERTIFIED mark is notably replaced with a stamp (Uptime Institute$^{®}$) registered to Uptime.

76.     Relying upon Uptime's false, material, misrepresentations of fact regarding Uptime's use of TIER IV UPTIME INSTITUTE CERTIFIED (and design), on December 10, 2013, the USPTO issued Registration No. 4446381 for the mark.

77.     On July 23, 2012, Uptime improperly filed service mark applications with the USPTO for the marks ACCREDITED TIER SPECIALIST (Ser. No. 85684221) and ACCREDITED TIER DESIGNER (Ser. No. 85684245) asserting (under penalty of perjury) that Uptime was using the marks for services in Class 41, when in fact, Uptime and/or Uptime IPS uses the marks to <u>certify</u> the services of individuals.

78.     Relying upon Uptime's false, material, misrepresentations of fact regarding use of the marks, on April 1, 2014, the USPTO issued Registration Nos. 4503935 and 4503936, respectively.

79.     On April 30, 2014, Uptime improperly filed service mark applications with the USPTO for the marks ATD ACCREDITED TIER DESIGNER UPTIME INSTITUTE (and Design) (Ser. No. 86267713) and ATD ACCREDITED TIER SPECIALIST UPTIME INSTITUTE (and Design) (Ser. No. 86267721) asserting (under penalty of perjury) that Uptime was using the marks for services in Class 41, when in fact, Uptime

- 17 -

and/or Uptime IPS uses the marks to <u>certify</u> the services of individuals.

80.     Relying upon Uptime's false, material, misrepresentations of fact regarding use of the marks, on January 13, 2015, the USPTO issued Registration Nos. 4670382 and 460383, respectively.

81.     Upon information and belief, but for Uptime's false, material, misrepresentations of fact regarding Uptime's use of the forgoing marks, the USPTO would not have issued Registration Nos. 4446381, 4503935, 4503936, 4670382 and 460383.

82.     Because Uptime's forgoing registrations were acquired by fraud on the USPTO, the registrations are *void ab initio* because they are not the proper type of registration, and they must be cancelled.

83.     Even if Uptime's registrations for service marks are proper, which they are not, the owner of a service mark must assert reasonable quality control over all third-party users of its service mark. Failure to assert reasonable quality control over third-party uses of a service mark (aka "naked licensing") results in total abandonment of all trademark rights.

84.     Uptime and/or Uptime IPS claims its service marks are valid and enforceable. However, Uptime and/or Uptime IPS has abandoned all rights in the marks due by failing to exert reasonable quality control over the hundreds of third-party uses of the marks.

85.     Uptime IPS does not own or hold any registrations for the Uptime Marks. Upon information and belief, Uptime IPS does not have a license agreement with Uptime for the trademark registrations. Moreover, upon information and belief, the hundreds of third-party users of the Uptime Marks do not have license agreements with Uptime for use of the marks. Upon information and belief, Uptime does not enter into licensing agreements with <u>any</u> of the third-party users of the Uptime Marks, including, without limitation Uptime IPS.

- 18 -

86.     Even if Uptime has granted third-party users implied licenses to use the Uptime Marks, such prolific third-party use of a service mark constitutes naked-licensing and results in total abandonment of the Uptime Marks and a loss of all trademark rights.

**Switch's Registration of the Distinctive TIER "ELITE"® and TIER 5® Marks**

87.     On or about February 28, 2012, Switch obtained registration of the mark TIER "ELITE"® on the USPTO Principal Register as Registration No. 4,104,346.  Switch has used this mark continuously in commerce since at least January 1, 2011.

88.     Further, Switch is using its TIER "ELITE"® mark in commerce in association with the Switch Services, including, but not limited to, the provision of computer services, telecommunications access services, and telecommunications communication networks.

89.     On or about December 8, 2015, Switch obtained registration of the mark TIER 5® on the USPTO's Principal Register as Registration No. 4,867,486. Switch has used, and continues to use, its TIER 5® mark in commerce in association with the Switch Services, including, but not limited to, the provision of computer services, telecommunications access services, and telecommunications communication networks.

90.     Based on its pioneering innovation and patent-pending design and operations of world-renowned data centers, telecommunications and cloud ecosystems, Switch created the independent TIER "ELITE"® and TIER 5® identifiers to distinguish Switch's industry-leading Switch Services from those offered by Switch's competitors.

91.     Switch also owns various trademark applications currently pending before the USPTO including, but not limited to:

    a.  TIER 5 PLATINUM HYBRID CLOUD – filed on May 4, 2018, Serial. No. 87908042;

    b.  TIER 5 PLATINUM HYBRID CLOUD – filed on May 4, 2018, Serial. No. 87908024

(collectively, "Switch Applications").[1]

92.     Switch's multistate and global operations, rapid corporate growth, considerable market and commercial successes, extensive marketing and advertising, and the variant channels of trade in which the Switch Marks are utilized and the Switch Services are delivered, have collectively contributed to the Switch Marks having acquired fame and distinctiveness.

93.     Switch has continuously used the Switch Marks in commerce in association with the Switch Services, and to identify, publicize and market the Switch Services.

94.     The filing date of Switch's application for its registered mark TIER "ELITE"® predates the filing dates of <u>all</u> the applications for the Uptime Marks.

**Proceedings Before the Trademark Trial and Appeal Board**

95.     Switch and Uptime are engaged in numerous disputes pending before the Trademark Trial and Appeal Board ("TTAB") regarding cancellation of registered marks and opposition to pending applications.

96.     Uptime's allegations in its TTAB Petitions to Cancel and Notices of Opposition go beyond merely challenging Switch's registrations, and set forth the elements for a cause of action for trademark infringement, including, among other things, allegations that Switch's use of its TIER 5®, TIER "ELITE"®, and TIER 5 PLATINUM HYBRID CLOUD trademarks, when used in connection with Switch's services, are likely to cause confusion, mistake, or to deceive consumers such that Uptime will be damaged by continued use and registration of Switch's marks.

97.     Furthermore, despite requesting several extensions over the last year and making representations it was interested in negotiating a settlement, on April 1, 2019, Uptime filed two more TTAB proceedings against Switch, opposing Switch's pending

---

[1] The marks identified in Paragraphs 83, 85, and 87 above are hereinafter referred to collectively as the "Switch Marks".

applications for its TIER 5 PLATINUM HYBRID CLOUD trademarks Proceeding Nos. 91247317 and 91247319.

98.    Based on Uptime's allegations in the TTAB proceedings, Switch has a reasonable apprehension of liability sufficient to satisfy the existence of an actual and justiciable controversy properly before this Court. As such, an actual case or controversy exists between the parties that cannot be resolved by the TTAB.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Breach of Contract)

99.    Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 96 as if fully set forth herein.

100.    In 2013 and 2014, Switch entered into valid contractual proposals with Uptime and/or Uptime IPS with regard to Switch's obtaining design, construction and operation certifications at the "Tier IV" level promoted by Uptime and/or Uptime IPS.

101.    As a material part of the benefit of the bargain, Switch expected—based on representations made by Uptime and/or Uptime IPS—that the Uptime and/or Uptime IPS certifications were valuable and would set Switch apart from Switch's competitors as Switch would be one of only a few "Tier IV" data centers certified by Uptime, and that Uptime and/or Uptime IPS had exclusive ownership or use rights to the "tier" classification standard and "tier" vernacular.

102.    Switch paid Uptime and/or Uptime IPS hundreds of thousands of dollars for the expected benefit of the bargain that Switch expected from its contractual proposals with Uptime and/or Uptime IPS.

103.    As alleged herein, Uptime and/or Uptime IPS failed to deliver the material benefits of the bargain expected by Switch. Uptime's and/or Uptime IPS's failures constitute breach of the contractual proposals by and between the parties.

///

- 21 -

104.    Switch has been damaged as a result of Uptime's and/or Uptime IPS's breaches of the contractual proposals, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

**(Deceptive Trade Practices in Violation of NRS 598.0903, *et seq*. and NRS 41.600)**

105.    Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 102 as if fully set forth herein.

106.    Switch has a cause of action for violation of Nevada's Deceptive Trade Practices Act, NRS 598.0903, *et seq.*, pursuant to NRS 41.600.

107.    Pursuant to NRS 598.0915, Uptime and Uptime are prohibited from engaging in deceptive trade practices by, among other things, knowingly: (a) making false representations as to the source, sponsorship, approval or certification of goods or services for sale; (b) making a false representation as to affiliation, connection, association with or certification by another person; (c) representing that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if [Uptime and/or Uptime IPS] know that they are of another standard, quality, grade, style or model; or (d) knowingly makes any other false representation in a transaction.

108.    By knowingly and intentionally issuing certifications which convey to the public that competitive data center(s) has attained a level of certification that it has not attained, Uptime and/or Uptime IPS engages in deceptive trade practices to the detriment of Switch.

109.    By knowingly and intentionally identifying competitive data center(s) on their websites in conjunction with misleading certifications that convey to the public the data center(s) has attained a level of certification that it has not attained, Uptime and/or Uptime IPS has engaged in deceptive trade practices to the detriment of Switch.

110.    By knowingly and intentionally permitting its clients and third parties to use the Uptime Marks in a deceptive, false, or untruthful manner, Uptime and/or Uptime

- 22 -

IPS has engaged in deceptive trade practices to the detriment of Switch.

111.    By knowingly, intentionally, and falsely claiming creation of the "tier" classification and "tier" vernacular, and that Uptime and/or Uptime IPS' program is overseen by the original author, Uptime and/or Uptime IPS has engaged in deceptive trade practices to the detriment of Switch.

112.    By knowingly and intentionally republishing white papers with creation and authorship attribution omitted with the intent of misleading the public into believing Uptime and/or Uptime IPS created the "tier" classification system and "tier" vernacular, Uptime and/or Uptime IPS has engaged in deceptive trade practices to the detriment of Switch.

113.    By knowingly, intentionally, and falsely representing to Switch that the Uptime and/or Uptime IPS certifications were valuable and would set Switch apart from Switch's competitors as Switch would be one of only a few "Tier IV" data centers in the world certified by Uptime, and by falsely representing to Switch that they had exclusive ownership or use rights to the "tier" classification standard and "tier" vernacular when in fact they did not have any such exclusive ownership and/or use rights, Uptime and/or Uptime IPS has engaged in deceptive trade practices to the detriment of Switch.

114.    Switch has been damaged as a result of Uptime's and/or Uptime IPS's deceptive trade practices in an amount to be proven at trial, and Switch is further entitled to all remedies available under the provisions of NRS Chapter 598.0903, *et seq.*

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Violation of 15 U.S.C. § 1120 and Cancellation of Registrations (15 U.S.C. § 1064))**

115.    Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 112 as if fully set forth herein.

116.    Switch is informed and believes, thereupon alleges, that Uptime procured registrations for the Uptime Marks by a false or fraudulent declaration or representation to the USPTO or by other false means.

117. Switch is informed and believes, and thereupon alleges, that the registered owner Uptime has not and is not using the Uptime Marks "in commerce" for the services identified in the registrations for the Uptime Marks and knowingly made false, material, misrepresentations of fact regarding the nature of its use of the Uptime Marks with the willful intent to deceive the USPTO for the purposes of obtaining registrations for the Uptime Marks.

118. Switch is informed and believes, and thereupon alleges, that Uptime intentionally committed a fraud on the USPTO by filing service mark applications, and providing misleading declarations under penalty of perjury, rather than seeking proper registration of its marks as certification marks.

119. Switch is informed and believes, and thereupon alleges, that Uptime intentionally misled the USPTO into registering its marks as service marks to avoid the more rigorous examination the USPTO conducts prior to approving registration of certification marks.

120. Switch is informed and believes, and thereupon alleges, that Uptime's false statements to the USPTO regarding the nature of Uptime and/or Uptime IPS's use of the Uptime Marks were material misrepresentations made with the intent to induce the USPTO to rely upon such false statements because Uptime and/or Uptime IPS knew at the time of filing they were using the Uptime Marks as certification marks and not service marks.

121. Switch is informed and believes, and thereupon alleges, Uptime and/or Uptime IPS predominantly perform services related to analysis for certification and not consulting.

122. Switch is informed and believes, and thereupon alleges, Uptime and/or Uptime IPS combined its dominant certification mark activities with its tertiary, if at all existent, consulting services in its applications for registration.

///

- 24 -

123.     Switch is informed and believes, and thereupon alleges, Uptime and/or Uptime IPS were aware that a certification mark may not be the same mark that the person uses as a service mark because using the mark for two contradictory purposes would result in confusion and uncertainty about the meaning of the mark and would invalidate the mark for either purpose.

124.     Switch is informed and believes, and thereupon alleges, that if not but for Uptime's false representations, the USPTO would not have issued registrations for the Uptime Marks without Uptime's meeting of the heightened application requirements for certification marks.

125.     Switch is informed and believes, and thereupon alleges, that Uptime made further false statements to the USPTO with the intent to preserve the registrations and improperly claim incontestability status for its TIER IV UPTIME INSTITUTE CERTIFIED (Reg. No. 4446381), ACCREDITED TIER SPECIALIST (Reg. No. 503935) and ACCREDITED TIER DESIGNER (Reg. No. 4503936) marks when it filed its Combined Declaration of Use and Incontestability under Sections 8 & 15 of the Lanham Act stating, under penalty of perjury, "[t]here is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court," when in fact, Uptime was well aware that the TTAB proceedings between the parties had been ongoing for several years.

126.     Based on its false and fraudulent conduct as alleged herein, Uptime and/or Uptime IPS is liable to Switch for damages pursuant to 15 U.S.C. § 1120, in an amount to be proven at trial.

127.     Switch is further entitled to a declaratory order cancelling all registrations for the Uptime Marks pursuant to 15 U.S.C. § 1119.

///

///

///

- 25 -

## **FOURTH CLAIM FOR RELIEF**

### **(Cancellation of Marks for Abandonment of Trademark Rights Pursuant to 15 U.S.C. §§ 1119 and 1064)**

128.     Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 127 as if fully set forth herein.

129.     Switch has been, and continues to be, damaged by the registrations for the Uptime Marks.

130.     Uptime's trademark registrations for the Uptime Marks are of the wrong type. Specifically, Uptime acquired service mark registrations, when in fact the Uptime Marks should be certification marks.

131.     Because the registrations for the Uptime Marks are of the wrong type, the registrations are *void ab initio*.

132.     Alternatively, cancellation of any and all of the Uptime Marks is proper because Uptime permits the use of the Uptime Marks for purposes other than certification, and/or Uptime discriminately uses and enforces the Uptime Marks to certify or continue to certify the services of third-parties who do not maintain the standards or conditions for which the Uptime Marks are used.

133.     Uptime does not use the Uptime Marks in association with the services identified in the registrations for the Uptime Marks and Uptime and/or Uptime IPS has failed to control, and/or is not able to legitimately exercise control over, the uses of the Uptime Marks in association with the certification for which Uptime and/or Uptime IPS purports to offer under the Uptime Marks.

134.     Even if the Uptime Marks are service marks, Uptime and/or Uptime IPS' failure to exercise the necessary quality control over third-party uses of the Uptime Marks, and Uptime's "naked" or unsupervised licensing of the Uptime Marks to third-parties, constitutes abandonment and a loss of all trademark rights.

///

- 26 -

135.    This Court has authority to order cancellation of all registrations for the Uptime Marks pursuant to 15 U.S.C. § 1119.

136.    Pursuant to 15 U.S.C. § 1064(3), Switch is being damaged by the registrations for the Uptime Marks, and such registrations should be cancelled pursuant to 15 U.S.C. § 1119.

**FIFTH CLAIM FOR RELIEF**

**(Violation of 15 U.S.C. § 1 -- Agreements in Restraint of Trade)**

137.    Switch hereby incorporates by this reference the foregoing allegations set forth in Paragraphs 1 through 136 as if fully set forth herein.

138.    Uptime possesses substantial market power in the relevant market, as demonstrated by Uptime's high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supra-competitive prices in the national data center services certification market.

139.    As alleged above, Uptime has entered into anticompetitive and discriminatory agreements with customers implemented with inconsistent and unfair procedures, biased towards paying infringers, in a "pay to play" model, with the purpose and effect of unreasonably restraining trade and commerce in the relevant market.

140.    Additionally, rather than providing the certification at a reasonable cost to all, Uptime charges hundreds of thousands of dollars per certification, and different amounts per customer.

141.    Uptime's solicitation and enforcement of the exclusionary contracts described above constitute unlawful agreements, contracts, and concerted activity that create an unreasonable barrier to entry to apply for or receive certification and/or recertification that unreasonably restrain trade in the relevant market in violation of Section 1 of the Sherman Act.

142.    Uptime's exclusionary contracts have foreclosed a substantial share of competitors and had anticompetitive effects in the relevant market.

143. Uptime's exclusionary contracts have no procompetitive benefit or justification. The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

144. As a result of Uptime's exclusionary contracts, and the harm to competition caused by those contracts, Switch has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

145. Switch is also entitled to recover from Uptime costs of suit, including unreasonable attorney fees, as provided by 15 U.S.C. § 15.

## SIXTH CLAIM FOR RELIEF

**(Violation of Nev. Rev. Stat. § 598A.060 -- Agreements in Restraint of Trade)**

146. Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 145 as if fully set forth herein.

147. Uptime possesses substantial market power in the relevant market, as demonstrated by Uptime's high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supra-competitive prices in the relevant market described above.

148. As alleged above, Uptime has entered into anticompetitive and discriminatory agreements with customers implemented without fair procedures with the purpose and effect of unreasonably restraining trade and commerce in the relevant market.

149. Uptime's solicitation and enforcement of the exclusionary contracts described above constitute unlawful agreements, contracts, and concerted activity that create an unreasonable barrier to entry to apply for or receive certification and/or recertification that unreasonably restrain trade in the relevant market in violation of Nevada Revised Statutes Section 589A.060.

150. Uptime's exclusionary contracts have foreclosed a substantial share of competitors and had anticompetitive effects in the relevant market.

- 28 -

151.    Uptime's exclusionary contracts have no procompetitive benefit or justification.    The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

152.    As a result of Uptime's exclusionary contracts, and the harm to competition caused by those contracts, Switch has suffered substantial injuries to its business and property in an amount to be proved at trial and automatically trebled, as provided by Nev. Rev. Stat. § 598A.210(2).

153.    Switch is also entitled to recover from Uptime costs of suit, including reasonable attorney fees, as provided by Nev. Rev. Stat § 598A.210(1) and (2).

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief -- 28 U.S.C. § 2201, *et seq.*)

154.    Switch hereby incorporates by this reference each and every allegation set forth in Paragraphs 1 through 160 as if fully set forth herein.

155.    Based on Uptime's allegations in the TTAB proceedings, which articulate the elements for a cause of action for trademark infringement, Switch has a reasonable apprehension of liability and such apprehension constitutes an actual and justiciable controversy pursuant to 28 U.S.C. § 2201, *et seq.*

156.    Furthermore, an actual case or controversy exists between Switch and Uptime with regard to: (a) the scope of the parties' rights in the term "Tier"; (b) the invalidity of Uptime's mark registrations for the wrong type of mark; (d) the scope of Uptime and/or Uptime IPS's rights, if any, in and to the Uptime Marks; and (d) whether Switch's use of the Switch Marks is confusingly similar and/or infringes on any rights Uptime and/or Uptime IPS may have in the Uptime Marks.

157.    Accordingly, Switch seeks a declaratory judgement from this Court pursuant to 28 U.S.C. § 2201 *et seq.*, that: (a) Uptime and/or Uptime IPS does not own valid, enforceable trademark rights in the term "Tier"; (b) that Switch has enforceable trademark rights in the Switch Marks; (c) Switch's use of the Switch Marks does not

infringe any rights, if any, Uptime and/or Uptime IPS has in the Uptime Marks; and (d) the Uptime Marks are invalid and/or *void ab initio*, and such mark registrations are therefore cancelled.

## PRAYER FOR RELIEF

WHEREFORE, Switch prays for entry of judgment and relief against Uptime and Uptime IPS as follows:

1. That Switch recover its actual and special damages in an amount to be proven at trial;

2. For an award of punitive and exemplary damages against Uptime for Uptime's oppressive, fraudulent and malicious acts as alleged herein;

3. That the Uptime Marks be cancelled from registration on the Principal Register of the USPTO;

4. That Switch recover its attorneys' fees and costs incurred in prosecuting this action pursuant to applicable statutes and law;

5. For entry of a declaratory judgment from this Court that:

    a. Uptime and/or Uptime IPS does not own valid, enforceable trademark rights in the term "Tier" and the Uptime Marks;

    b. Switch has enforceable trademark rights in the Switch Marks;

    c. Switch's use of the Switch Marks does not infringe any rights, if any, Uptime and/or Uptime IPS may have in the Uptime Marks; and

    d. the Uptime Marks are invalid and/or *void ab initio*, and such mark registrations are therefore cancelled

6. That Switch be awarded such other and further relief as this Court deems just and equitable.

///

///

- 30 -

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this ___ day of January, 2020.

**SWITCH, LTD.**

_____

SAMUEL D. CASTOR, ESQ (NBN 11532)
ANNE-MARIE BIRK, ESQ. (NBN 12330)
7135 South Decatur Blvd.
Las Vegas, Nevada 89118

JAMES D. BOYLE, ESQ. (NBN 08384)
JOANNA M. MYERS, ESQ. (NBN 12048)
JESSICA M. LUJAN, ESQ. (NBN 14913)
**HOLLEY DRIGGS WALCH**
**FINE PUZEY STEIN & THOMPSON**
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

*Attorneys for Plaintiff / Counter-Defendant*
*Switch, Ltd.*

Pursuant to F.R.C.P. 5(b), I hereby certify that on this ___ day of January, 2020, I served a true and correct copy of the above document, **SECOND AMENDED COMPLAINT FOR: (1) BREACH OF CONTRACT; (2) DECEPTIVE TRADE PRACTICES; (3) VIOLATION OF 15 U.S.C. § 1120; (4) CANCELLATION AND ABANDONMENT UNDER 15 U.S.C. §§ 1119 AND 1064; (5) VIOLATION OF 15 U.S.C. § 1; (6) VIOLATION OF NEV. REV. STAT. § 598A.060; (7) DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**, via the Court's electronic filing/service system (CM/ECF) to all parties on the current service list, as follows:

Chad R. Fears, Esq.
Nevada Bar No. 6970
Joshua D. Cools, Esq.
Nevada Bar No. 11941
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102
Email: cfears@efstriallaw.com
Email: jcools@efstriallaw.com

Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Email: jennifer.insley-pruitt@dechert.com

_____
An agent of SWITCH, LTD.